NEWMAN, Cii'cuit Judge,
dissenting.
I respectfully dissent, for this panel has no authority to revoke our prior decision in Cienega Gardens v. United States, 331 *1292 F.3d 1319 (Fed.Cir.2003) (Cienega VIII). The threshold issues here reviewed were already decided; that decision is the law of this case. The National Housing Act of 1968 led to the program here at issue, where the federal government provided financial incentives to private investors to construct housing to be rented to low-income tenants at rents below the market rate. The investment incentives included guaranteed 40-year mortgages from Fannie Mae at low interest, cost contributions, and other substantial economic subsidies and incentives. In return, the housing owners were limited in the rents they could charge, the income they could earn, and the changes they could make. After twenty years the owner could choose to prepay the subsidized mortgage and remove the property from the arrangement; the property owners had the unencumbered right to do so. An implementing regulation provided:
24 C.F.R. § 236.30 (1970). A mortgage indebtedness may be prepaid in full and the Commissioner’s controls terminated without the prior consent of the Commissioner where ... the prepayment occurs after the expiration of 20 years from the date of final insurance endorsement of the mortgage....
As the Court of Federal Claims observed, the right to leave the program after twenty years was an “incentive [that] enabled property owners to provide low-income housing for twenty years, and then terminate the low-income housing restrictions and make a long-term profit by charging market rates for rentals at the properties.” Cienega Gardens v. United States, 67 Fed. Cl. 434, 440 (2005) (Cienega IX).
As twenty years approached, the owners invoked the right to prepay the mortgage and leave the plan. Congress then enacted the ELIHPA (the Emergency Low Income Housing Preservation Act of 1987), which prohibited leaving the plan, and then in 1990 the LIHPRHA (Low Income Housing Preservation and Resident Home-ownership Act), which provided a partially mitigating arrangement after twenty years. The statutes are complex. This and related litigation followed; for these plaintiffs, the first Cienega Gardens case was filed in 1994. Prepayment rights were eventually restored by the Housing Opportunity Program Extension Act of 1996 (HOPE). The question of whether a constitutional “taking” occurred during the interim period was fully discussed and finally decided in (Cienega VIII). That decision is the law of this case, as to the four “model plaintiffs” whose facts were the premises of the takings analysis, and as to the other similarly situated plaintiffs. The Cienega VIII decision and remand to the Court of Federal Claims was with instructions to apply that law to determine whether a taking occurred on the specific facts of each plaintiff, and to assess damages. In the case now on appeal there are eight plaintiffs for eight properties, including Cienega Gardens. The trial court visited the sites, conducted twenty-two days of trial, and assessed damages. Cienega IX, 67 Fed.Cl. 434 (2005) is the decision now before us.
This court in Cienega VIII resolved that the legislative enactments that forbade removing this privately-owned housing from the low-income low-rent market after twenty years, and then restored that right, were a temporary taking of property within the purview of constitutional protection. That aspect was reached and decided. This court so recognized in Independence Park Apartments v. United States, 449 F.3d 1235 (Fed.Cir.2006):
[In Cienega VIII] we held — based on the factual findings made in Cienega *1293 III — that the plaintiffs had suffered a “serious financial loss” by being deprived of the opportunity to prepay their mortgages. See Cienega VIII, 331 F.3d at 1340-45. Based on our analysis of the Penn Central factors and the extensive record already developed in the case, we ruled in favor of the plaintiffs on their regulatory takings claims.
Id. at 1239-40.
In Cienega VIII this court reviewed the “Use Agreements” that were made available by the LIHPRHA, and explored the various mechanisms whereby owners responded to the legislative changes until Congress reversed itself via the legislation enacted in HOPE. The remand to the Court of Federal Claims was with instructions to consider these individual differences and assess damages accordingly. This court ruled that the prepayment right was “the critical inducement” to enter the program, and that “they would not have participated in the programs otherwise.” Cienega VIII, 331 F.3d at 1334, 1348. Those issues are closed; these rulings bind this panel, as they bound the Court of Federal Claims in Cienega IX. After thirteen years of litigation, the remaining issue is the application of Cienega VIII and the assessment of damages; this panel has no authority to revoke Cienega VIII.
My colleagues acknowledge that this court in Cienega VIII ruled that “the four model plaintiffs had suffered a compensable temporary regulatory taking,” maj. op. at 1275, but state that this court acted “on a partial record and limited arguments made by the government,” apparently impeaching the parties, the trial court, and ourselves. This is as unwarranted as it is incorrect. In Independence Park Apartments, 449 F.3d at 1240, another panel of this court remarked on “the extensive record already developed in the [Cienega ] case.” If there indeed were inadequate arguments by the government and an incomplete record at trial, the concern should have been raised by the panel in that appeal, not four years later when the trial court has acted on and fulfilled the remand instructions, conducted lengthy proceedings, and completed a thorough application of this court’s decision in accordance with its terms. See Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (1986) (if the appellate court is dissatisfied with the adequacy of the record and is unable to reach a proper resolution of the legal question, the proper course is to remand to the trial court). Review of the eight Cienega cases makes clear that the record and presentation in Cienega VIII cannot be discarded as “partial” and “limited,” for they were thorough and complete, as well as built on the seven earlier Cienega trials and decisions.
On this appeal, the government repeats the arguments it presented in Cienega VIII, shifting its emphasis to the argument that the congressional goal of protecting low-income tenants served an “important public interest.” In Cienega VIII this court agreed: “Unquestionably, Congress acted for a public purpose (to benefit a certain group of people in need of low-cost housing), but just as clearly, the expense was placed disproportionately on a few private property owners.” 331 F.3d at 1338. This court explored whether this was “the kind of expense-shifting to a few persons [that] amounts to a taking,” id. at 1338-39, and applied the principles of Pennsylvania Coal Co. v. Mahon, 260 U.S. 393, 43 S.Ct. 158, 67 L.Ed. 322 (1922) that the “strong public desire to improve the public condition is not enough to warrant achieving the desire by a shorter cut than *1294 the constitutional way of paying for the change,” id. at 416, 43 S.Ct. 158. As reiterated in Lingle v. Chevron U.S.A., Inc., 544 U.S. 528, 125 S.Ct. 2074, 161 L.Ed.2d 876 (2005), “the Takings Clause presupposes that the government has acted in pursuit of a valid public purpose.” Id. at 543, 125 S.Ct. 2074. The Constitution assures that when the government changes its obligations to private entities with which it has entered into contractual and other specific relationships, the government is as responsible for its direct violation of those relationships as would be any private person. See Mobil Oil Exploration & Producing Southeast, Inc. v. United States, 530 U.S. 604, 607-08, 120 S.Ct. 2423, 147 L.Ed.2d 528 (2000) (the United States is bound by the same principles of contract law as in contracts between private persons). Legislative abrogation of property rights, albeit for public purpose, is tolerated because the Constitution assures that the contracting party is not required to bear the burdens of the public as a whole. In United States v. Winstar, 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) the Court explained: “Just as we have long recognized that the Constitution lbar[s] Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole,’ so we must reject the suggestion that the Government may simply shift costs of legislation onto its contractual partners who are adversely affected by the change in the law, when the Government has assumed the risk of such change.” Id. at 883, 116 S.Ct. 2432 (quoting Dolan v. City of Tigard, 512 U.S. 374, 384, 114 S.Ct. 2309, 129 L.Ed.2d 304 (1994)).
The issues on this appeal are limited to the application by the Court of Federal Claims of the remand instructions of Ciénega VIII. Instead, this court proposes that the trial court redecide the basic question of whether a taking occurred at all.[1] No new arguments have been presented, nor any previously unavailable factual information, nor any other basis for reopening what is closed. It is singularly unfair to these plaintiffs to require them to start again, after thirteen years of judicial process.
The issue of this appeal, the appropriate measure of damages, is barely touched. The trial court received extensive briefing and argument and evidence, including expert testimony from all sides. The court gave weight to the partial mitigation by those owners who accepted the “Use Agreements,” and evaluated the issues of the owners who sold their properties while the law was in effect. A serious flaw in the majority’s analysis is its blurring of the distinction between liability and damages, resulting in its skewed approach to the takings analysis. The panel majority’s new requirement that the owners must prove that the right to leave the program after twenty years was “the primary incentive” for their initial participation in the program is contrary to all of the rules of evaluating integrated contractual arrangements, for each provision and obligation is deemed significant to the whole. Whatever weight a party may have given to each of the complex restrictions and benefits, this absolute prepayment right was included in all of the arrangements. The prepayment right has been demonstrated, by the experience of this litigation, to be of large economic significance. The prepay- *1295 merit right was included in all of the relevant documents and prospectuses, as well as in the authorizing legislation and regulations. It is not disputed that the removal of this condition spawned this litigation.
My colleagues apply another incorrect premise, for the value of property is measured when it is taken. See First English Evangelical Lutheran Church of Glendale v. Los Angeles County, 482 U.S. 304, 320, 107 S.Ct. 2378, 96 L.Ed.2d 250 (1987) (“the valuation of property which has been taken must be calculated as of the time of the taking”); Almota Farmers Elevator & Warehouse Co. v. United States., 409 U.S. 470, 474, 93 S.Ct. 791, 35 L.Ed.2d 1 (1973) (“the owner is entitled to the fair market value of his property at the time of the taking.”) We need not speculate whether the government would have designed a different arrangement in 1968 had the future housing situation been foreseen, or what variation in incentives would have been needed to obtain private participation; the panel majority errs in suggesting that because some other terms might have obtained the required low-rent housing, those other terms now determine the economic consequences of legislative annulment of the terms that were actually put into place.
The creative theories propounded by my colleagues for redetermining whether a taking occurred ignore the law of this case, as well as the constitutional authority that holds the government to its obligations. I must, respectfully, dissent.

. The court is not here acting en banc; we simply consolidated the two appeals and enlarged the panel. En banc action is required to overturn prior final decisions.